## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| WILLIAM J. MARSELLOS, | CIVIL ACTION 1:14-cv-04442 |
| Plaintiff, | |
| v. | COMPLAINT |
| CAVALRY SPV I, LLC and CAVALRY PORTFOLIO SERVICES, LLC, | JURY TRIAL DEMANDED |
| Defendants. | |

### COMPLAINT FOR RELIEF PURSUANT
### TO THE FEDERAL FAIR DEBT COLLECTION PRACTICES ACT

NOW COMES the Plaintiff, WILLIAM J. MARSELLOS ("William"), by and through his attorneys, SULAIMAN LAW GROUP, LTD., complaining of the Defendants, CAVALRY SPV I, LLC and CAVALRY PORTFOLIO SERVICES, LLC, as follows:

### NATURE OF THE ACTION

1.      William brings this action for damages for Defendants' violations of the Fair Debt Collection Practices Act, 15 U.S.C. §1692, et seq. ("FDCPA") and violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, et. seq. ("ICFA").

### JURISDICTION AND VENUE

2.      This action arises under, and is brought pursuant to, the FDCPA. Subject matter jurisdiction is conferred upon this Court by 15 U.S.C. §1692k and 28 U.S.C. §§1331, 1337, as this action arises under the laws of the United States, and supplemental jurisdiction exists for state law claims pursuant to 28 U.S.C. §1367.

1

3.      Venue is proper in this Court pursuant to 28 U.S.C. §1391; Defendants conduct business in the Northern District of Illinois and all of the events or omissions giving rise to the claim occurred within the Northern District of Illinois.

## PARTIES

4.      William is a natural person who resides in the Northern District of Illinois and is a "consumer," as defined by the FDCPA, 15 U.S.C. §1692a(3).

### Cavalry SPV I, LLC

5.      Defendant Cavalry SPV I, LLC ("Cavalry") is a limited liability company chartered under Delaware law that transacts business in Illinois. Cavalry's principal place of business is located at 500 Summit Lake Drive, Suite 400, Valhalla, New York 105951. Cavalry's registered agent in Illinois is CT Corporation System, located at 208 South LaSalle Street, Suite 814, Chicago, Illinois 60604.

6.      Cavalry is in the business of taking title or claiming to take title to charged-off debts allegedly owed by consumers and originally owed to others.

7.      Cavalry then seeks to enforce the alleged debts against the consumers through lawsuits.

8.      The mails and telephone system are used in connection with the prosecution of the Cavalry lawsuits.

9.      Cavalry is a "debt collector," as defined by the FDCPA, 15 U.S.C. §1692a(6).

### Cavalry Portfolio Services, LLC

10.      Defendant Cavalry Portfolio Services, LLC ("CPS") is a limited liability company chartered under Delaware law that transacts business in Illinois. CPS's principal place of business is located at 4050 East Cotton Center Boulevard, Building 2, Suite 20, Phoenix, Arizona

85040. CPS's registered agent in Illinois is CT Corporation System, located at 208 South LaSalle Street, Suite 814, Chicago, Illinois 60604.

11.     CPS is a debt collector; it performs recovery services for its affiliate, Calvalry.

12.     CPS is a "debt collector," as defined by the FDCPA, 15 U.S.C. §1692a(6).

## FACTS SUPPORTING CAUSE OF ACTION

13.     Cavalry has been attempting to collect from William a debt alleged to have been originally owned by Bank of America/FIA Card Services, N.A. ("FIA," or "FIA account").[1]

14.     On or about October 18, 2013, Cavalry filed a complaint in the Circuit Court of Cook County, Illinois against William. The case was captioned *Cavalry SPV I, LLC  v. William J. Marsellos*, case number 2013-M1-157491 ("collection case"). *See* Exhibit A, a true and correct copy of the collection case complaint ("Cavalry's complaint").

15.     In the collection case, Cavalry alleges that it purchased and now owns the FIA account. Cavalry's complaint was solely supported by the affidavit of Sheila Pinckney ("Pinckney"), a purported employee of CPS. *See* Exhibit A.

### The Debt Buying Industry

16.     Cavalry is a debt buyer. Debt buying is the practice of purchasing charged-off debts from debt originators, or other debt buyers. These debts are purchased in bulk and are usually credit card debts.

17.     Debts sold by original creditors are typically bundled into portfolios because bundling accounts into portfolios reduces the transactions costs of exchange. *See* Federal Trade Commission, The Structure and Practices of the Debt Buying Industry, January 2013, available at http://www.ftc.gov/reports/structure-practices-debt-buying-industry (last visited March 5, 2014) ("FTC Debt Buyer Report").

[1] Calvary does not specify whether William allegedly opened the FIA account with FIA or Bank of America.

3

18.     When purchased, these bundled account portfolios are transferred via electronic data files that contain only a few data elements from the original account records. When printed out, the electronic evidence of the sale, or data file, consists of one line per debtor.

19.     The typical data file contains the original account number, the name of the consumer, the address of the consumer, the last balance purportedly owed, the date of the last payment, and the date that the account was charged-off. *Id*. at pp. 34-35.

20.     Debt buyers generally do not obtain the original account records (the day-to-day transactions on the account that are generally made at or near the time of each transaction, in the normal course of business) related to the purchased debts.  For most portfolios, buyers do not receive any documents at the time of purchase. Only a small percentage of portfolios include documents such as account statements or the terms and conditions of credit. *Id*. at p. iii.

21.     The data files obtained by debt buyers are not the original account records that were created in the regular course of business by the credit originator—they are created prior to the sale of a portfolio of charged-off debts. They are created for sale to a third party, and are not created in the regular course of servicing the credit card account.

22.     Furthermore, debt sales are typically "as-is," with limited or no ability to obtain additional information from the original creditor; debt sellers generally disclaim the accuracy of the information transferred in the data file. *See* FTC Debt Buyer Report at p. 25.

23.     Where different debt buyers enter into purchase and sale agreements with the same seller, the structure, organization, and phrasing of these agreements are virtually identical. *Id.* at pp. 24-25.

4

24.     Cavalry relied on the information that it allegedly obtained from FIA (the data file) when it filed the Collection case.[2]

25.     However, Cavalry had absolutely no assurance that the information it received was accurate because, on information and belief, FIA allegedly sold its debts to Cavalry, or its successor in interest, in "as-is" condition.

26.     The information on which Cavalry relied to file the state court action would not be considered satisfactory evidence if submitted to court. A document is not admissible as a "business record" under Illinois law if "the source of information or the method or circumstances of preparation indicate lack of trustworthiness …" Illinois R. Evid. 803(6).

27.     It is common practice in the industry to purchase debts without obtaining original account information due to the time and cost of obtaining such documentation.

### Pattern and Practice in State Court Collection Actions

28.     Cavalry routinely files state court collection actions with no more evidence of the debt in question than the single line data file described above.

29.     Cavalry knows that the information on which it relies to file the state court collection actions will not be supported with adequate evidence, yet Cavalry is not willing or not able to obtain such evidence.

30.     Usually when Cavalry files a collection action it obtains a default judgment against the consumer.

31.     Upon information and belief, the default rate in such lawsuits may be as high as ninety percent.

---

[2] Actually, Cavalry does not allege that it purchased the FIA account directly from FIA; the Pinckney affidavit and other pleadings are unclear as to the FIA account's chain of title. Regardless, if the FIA account was sold, it was done so in the manner described above; any subsequent buyer would have received the one line data file "as-is."

32.     The default rate is so high in the collection actions because Cavalry serves the consumer with a complaint and affidavit falsely alleging Cavalry's ability to prove the information contained therein.

33.     The purpose of such affidavits is to deceive the consumer into believing that Cavalry can prove the case at trial and to intimidate the consumer into payment.

34.     The collection case affidavits are deceptive because they purport to be based on a review of "computerized account records," which CPS "maintains in the routine course of business … with entries made at or very near the time of any such occurrence," and that Pinckney "could testify to the matters set forth herein." *See* Exhibit A, Pinckney affidavit at ¶6.

35.     In truth, the affidavits are created from the one line data file that Cavalry allegedly purchased "as-is."

36.     By submitting such an affidavit to the consumer, while concealing documents in which the alleged account seller effectively disclaims the accuracy of its records and information, Cavalry perpetrates a fraud on the consumer.

37.     Accordingly, the consumer is discouraged from defending the lawsuit or challenging the allegations contained in the complaint and affidavit.

38.     Cavalry actively conceals the nature of its defective standing; an unsophisticated consumer would not know that these "as-is" purchase agreements exist.

39.     An unsophisticated consumer would not be aware of the elements of the business records exception to the rule against hearsay.

40.     When Cavalry files a collection action against a consumer, it  implicitly represents that the allegations and factual contentions contained in the complaint and affidavit are backed by evidentiary support. Federal Rule of Civil Procedure 11(B)(3) states:

Representations to the Court. By presenting to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it—an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:

(1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;

[]

(3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery

Fed R. Civ. Proc. 11(B)(3).

41.     In these *ex parte* collection actions Cavalry does not disclose to the court that it has not conducted a reasonable investigation into its claims or that it would never have presented evidence to support its claims. *See* Comment 14 to Rule 3.3 of the Illinois Rules of Professional conduct, which states: "… in any *ex parte* proceeding … [t]he lawyer for the represented party has the correlative duty to make disclosures of material facts known to the lawyer and that the lawyer reasonably believes are necessary to an informed decision."

42.     Cavalry does not conduct a reasonable investigation into a debt's existence in the collection actions it files; rather Cavalry intends to obtain a default judgment against the consumer by falsely representing to the consumer and the court, through the filing of its complaint and affidavit, that it has evidence to support the claims stated therein.

43.     In reality, Calvary never intends to proceed to trial; it knows that it cannot prevail at trial.

44.     This practice amounts to an unfair, deceptive and improper use of the court system in connection with the collection of a debt.

7

45.     A recent supervisory report issued by the Consumer Finance Protection Bureau states that its examiners found that, in 70% of lawsuits filed by a debt buyer, the debt buyer dismissed its case when the consumer filed an answer. Consumer Financial Protection Bureau, *Supervisory Highlights*, Spring 2014, pg. 14, available at: http://files.consumerfinance.gov/f/201405_cfpb_supervisory-highlights-spring-2014.pdf (last visited June 11, 2014).

46.     The report stated, "Despite the entity's express or implied representations to consumers that it intended to establish that consumers owed a debt in the amount claimed in court filings, in numerous instances, the entity misled consumers because it demonstrably had no such intention." *Id.*

47.     Once the default judgment is entered Cavalry can proceed to garnishment regardless of whether it could have proven its case at trial.

48.     Cavalry routinely voluntarily dismisses cases where the consumer appears before the court to defend the action in order to protect its business model and avoid losing at trial.

**William's Defense of the Collection case**

49.     Cavalry was able to obtain a default judgment against William on December 3, 2013. *See* Exhibit B, a true and correct copy of the court docket for the collection case, number 13 M1 157491.

50.     On or about December 17, 2013, William retained Sulaiman Law Group, Ltd. ("counsel") to defend the collection case, and counsel filed its appearance on or about December 31, 2013. *Id.*

51.     On January 3, 2014, William, via counsel, filed a Motion to Vacate the December 3, 2013 default judgment. *See* Exhibit C, a true and correct copy of William's Motion to Vacate.

8

52. On January 14, 2014, William's Motion to Vacate was granted and the collection case was continued for status on March 18, 2014. *See* Exhibit D, a true and correct copy of the January 14, 2014 Order.

53. On March 18, 2014, William, via counsel, appeared at the status call, and the collection case was set for trial on May 6, 2014. *See* Exhibit E, a true and correct copy of the March 18, 2014 Order.

54. On the date of trial, May 6, 2014, counsel met with Cavalry's attorney outside the courtroom before trial. The Cavalry attorney stated to counsel that she had a witness and was ready to proceed with trial, unless William was willing to "settle" the account. Counsel advised the Cavalry attorney that William was not interested in settlement, and that he would proceed with trial.

55. When the case was called, the Cavalry attorney stated to the Judge that her witness was present in another courtroom and that they were ready to proceed with trial, at which point the Judge passed the case until the end of the call for trial.

56. Despite Cavalry's continued assertion that it could demonstrate its standing and would be presenting its case at trial, when the case was called for trial, the Cavalry attorney stated that her witness had to leave to catch a flight and requested to non-suit the collection case without prejudice.

57. Over Counsel's objection, the Judge granted the Calvary attorney's request for a dismissal without prejudice. *See* Exhibit F, a true and correct copy of the collection case order entered on May 6, 2014.

58.     Cavalry voluntarily dismissed the collection case because Cavalry knew that it could not demonstrate the accuracy of the information contained in its complaint, or that it even owned the FIA account at all.

59.     Even if Cavalry had intended to take the collection case to trial, it would have been unable to prevail at trial due to its lack of evidence demonstrating ownership of the FIA account and the accuracy of the information contained in Cavalry's complaint described above.

60.     By operation of law, Cavalry has one year or until the statute of limitations expires, whichever is longer, to re-file its case against William.

61.     William is left to wonder when or if he will be served with another summons containing another deceptive affidavit and baseless complaint.

62.     This uncertainty has caused William significant stress and emotional distress.

63.     William was harmed by Cavalry's unfair and deceptive practices because he had to spend time and energy defending against Cavalry's frivolous lawsuit.

64.     William was further harmed by Cavalry's unfair and deceptive practices, as she incurred costs defending against Cavalry's frivolous lawsuit, including retaining counsel.

**COUNT I - VIOLATION OF FDCPA (against Cavalry and CPS)**

65.     William repeats and realleges paragraphs 1 through 64 as though fully set forth herein.

66.     The collection case was an attempt to collect a "consumer debt" as defined by the FDCPA, 15 U.S.C. §1692a(5).

67.     CPS is liable for its participation in the collection case by virtue of its false Pinckney affidavit.

68.     Defendants violated 15 U.S.C. §§1692e, e(2), e(5), e(10) and (f) by filing the collection case based on unverified account information.

69.     Defendants violated 15 U.S.C. §1692e and e(10) by using a false, deceptive, or misleading representation or means in connection with the collection of any debt. The filing of the collection case was false and deceptive because Cavalry could not demonstrate ownership of the FIA account. As discussed above, the false Pinckney affidavit was intended to deceive and intimidate William into paying Cavalry on the FIA account by misrepresenting the evidentiary support for the claims asserted therein, including that Cavalry purchased the FIA account and the balance due.

70.     Cavalry's complaint and the Pinckney affidavit are inherently deceptive, false, and misleading because they are based on unverified information that Cavalry allegedly acquired "as-is" (the single-line data file), not the original account records. Yet, the Pinckney affidavit falsely represents that Cavalry could prove the claims set forth therein. *See* Exhibit A.

71.     Defendants violated 15 U.S.C. §1692e(5) by threatening to take action that it did not intend to take when it filed the collection case knowing that it could not prevail at trial, and that it would dismiss its case if challenged. As stated above, Cavalry does not intend to prove its case at trial; rather its business model is to obtain a default judgment or dismiss the action to avoid getting caught and losing at trial. Furthermore, Cavalry continued to assert its ability to prove its case right up to the moment of trial, all the while knowing it did not intend to stand trial.

72.     Defendants violated 15 U.S.C. §1692e(2) by falsely representing the character, amount, and status of the FIA account because Cavalry did not own the FIA account. Even if Cavalry did own the FIA account, it would have no way of verifying the amount claimed. Thus,

11

Cavalry's assertions as to its ownership and knowledge of the FIA account information set forth in the Cavalry complaint and Pinckney affidavit were false.

73.     Defendants violated 15 U.S.C. §1692(f) by using unfair means to collect or attempt to collect any debt; Cavalry's filing of the collection case, while knowing that it could not prevail at trial, was unfair because William had to spend time and money defending against a frivolous lawsuit. Moreover, Cavalry's pattern and practice of filing collection actions against consumers, without conducting a reasonable investigation into its claims or disclosing its lack of evidence, with the intent of obtaining a default judgment, amounts to an unfair debt collection practice effectuated through the courts. This practice is unfair to the consumer and against public policy.

74.     Defendants were aware at the time that Cavalry allegedly purchased the FIA account that any data they received was being sold "as-is" and that the could not verify the accuracy of the data.

75.     Nevertheless, CPS executed the Pinckney affidavit and Cavalry filed the collection case in order to intimidate William to pay the money that Defendants alleged was owed.

76.     Cavalry's complaint and the Pinckney affidavit represent  material violations of the FDCPA because they effectively deceive consumers into believing that Cavalry can prove ownership of the alleged debt when it cannot.

77.     It is Cavalry's regular business practice to file claims against consumers even though it cannot verify the data in its complaints.

78.     It is CPS's regular business practice to prepare deceptive affidavits even though it cannot verify the data contained therein.

12

79.     As pled in paragraphs 61 through 64 above, William was harmed by Defendant's unfair and deceptive practices.

80.     William is therefore entitled to an award of statutory damages, actual damages, and legal fees pursuant to 15 U.S.C. §1692k.

WHEREFORE, Plaintiff, WILLIAM J. MARSELLOS, respectfully requests that this Honorable Court enter judgment in her favor as follows:

a.  declaring that the practices complained of herein are unlawful and violate the aforementioned statutes and regulations;

b.  awarding Plaintiff statutory and actual damages, in an amount to be determined at trial, for the underlying FDCPA violations;

c.  ordering the deletion of all adverse credit reporting related to the alleged debt;

d.  awarding Plaintiff costs and reasonable attorney fees as provided under 15 U.S.C. §1692k; and

e.  awarding any other relief as this Honorable Court deems just and appropriate.

## COUNT II - VIOLATION OF ICFA (against Cavalry and CPS)

81.     William restates and realleges paragraphs 1 through 64 as though fully set forth herein.

82.     CPS is liable for its participation in the collection case by virtue of its false Pinckney affidavit.

83.     Defendants violated 815 ILCS 505/2 by engaging in an unfair and deceptive act or practice by using fraud, deception, and misrepresentation in their efforts to collect an unverified debt from William; Defendants' active participation in the collection case, while knowing that they could not prevail at trial, was intended only to deceive William into thinking he would have to pay Cavalry to avoid a judgment against him.

84. Defendants do not conduct a reasonable investigation into a debt's existence in the collection actions Cavalry files; rather they intend to obtain a default judgment against the consumer by representing to the consumer and the court, through the filing of its complaint and affidavit, that Cavalry has evidence to support the claims stated therein.

85. Cavalry's pattern and practice of filing collection actions against consumers, without conducting a reasonable investigation into its claims or disclosing its lack of evidence, with the intent of obtaining a default judgment, amounts to an unfair debt collection practice effectuated through the courts.

86. Defendants' pattern and practice described above amounts to an unfair, deceptive and improper use of the courts in connection with the collection of a debt.

87. The Illinois Consumer Fraud and Deceptive Business Practices Act (ICFA) states:

Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact … in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.

815 ILCS 505/2.

88. William is a consumer as defined by ICFA, 815 ILCS 505/1(e).

89. Defendants' attempt to collect a debt is part of the conduct of any trade or commerce as defined by ICFA, 815 ILCS 505/1(f).

90. The collection case and the related complaint and Pinckney affidavit represent the use of deception, fraud and false pretense in an attempt to collect an unverified debt.

91. Defendants' active concealment of Cavalry's lack of evidence to support its claims represents a material misrepresentation, made in the conduct of trade or commerce.

92.     Defendants intended that William rely on its misrepresentations and pay Cavalry for the FIA account.

93.     Additionally, Cavalry's abusive trial strategy was inherently unfair to William—Cavalry represented that it could prove its case at trial, and that it would be able to demonstrate its standing to sue at trial. All the while, Cavalry knew it could not support its case with sufficient evidence and it never intended to go to trial.

94.     As a result of this unfair and deceptive conduct, William had to expend time and money defending against a lawsuit that Cavalry had no intention of litigating.

95.     ICFA further states:

> Any person who suffers actual damage as a result of a violation of this Act committed by any other person may bring an action against such person. The court, in its discretion may award actual economic damages or any other relief which the court deems proper.

815 ILCS 505/10a.

96.     William was harmed by Defendants' unfair and deceptive practices because he had to spend time and energy defending against Cavalry's frivolous lawsuit.

97.     William was further harmed by Defendants' unfair and deceptive practices as he incurred costs by retaining counsel to defend against the frivolous lawsuit.

98.     William was also exposed to significant emotional strain as a result of the Defendants' unfair and deceptive business practices.

99.     Moreover, upon information and belief, these unfair and deceptive practices are part of a pattern and practice of behavior in which Defendants routinely engage as part of their business model.

100.    An award of punitive damages is appropriate because Defendants' conduct described above was willful and wanton, and showed a reckless disregard for the protections afforded by ICFA, and William's rights thereunder.

101.    As such, William is entitled to relief pursuant to 815 ILCS 505/10a.

WHEREFORE, Plaintiff, WILLIAM J. MARSELLOS, respectfully requests that this Honorable Court enter judgment in her favor as follows:

a.  declaring that the practices complained of herein are unlawful and violate the aforementioned statutes and regulations;

b.  awarding Plaintiff actual damages and punitive damages, in an amount to be determined at trial, for the underlying violations;

c.  ordering the deletion of all adverse credit reporting related to the alleged debt;

d.  awarding the Plaintiff costs and reasonable attorney fees; and

e.  awarding any other relief as this Honorable Court deems just and appropriate.

Dated: June 13, 2014                         Respectfully Submitted,

                                             /s/ Daniel J. McGarry
                                             Mathew H. Hector, Esq. ARDC#6283058
                                             Daniel J. McGarry, Esq. ARDC#6309647
                                             Counsel for Plaintiff
                                             Sulaiman Law Group, LTD
                                             900 Jorie Blvd, Ste 150
                                             Oak Brook, IL 60523
                                             Phone (630)575-8181
                                             Fax: (630)575-8188